CLERK'S OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED
JUL 13 2011
JULIA C. DUDLEY, CLERK
BY: /s/ Paul Newman
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION

| | |
|---|---|
| PETER S. JARMAK,<br><br>                      *Plaintiff,*<br><br>v.<br><br>REBECCA H. RAMOS A/K/A REBECCA CLARKE<br>A/K/A REBECCA JOHNSON,<br>                      *Defendant.* | CASE NO. 6:10-cv-00048<br><br>MEMORANDUM OPINION<br><br>JUDGE NORMAN K. MOON |

This matter is before the Court upon Defendant's Motion for Summary Judgment (docket no. 11). I have fully considered the arguments and authorities set forth in the parties' filings, as well as those presented at the June 29, 2011 hearing. For the following reasons, I will grant Defendant's Motion for Summary Judgment.

## I. BACKGROUND

Plaintiff Peter S. Jarmak ("Plaintiff" or "Mr. Jarmak") sued defendant Rebecca H. Ramos (also known as Rebecca Clarke) ("Defendant" or "Ms. Ramos") in negligence for injuries he allegedly suffered on October 4, 2008 as a result of falling through a rotted hammock on Defendant's property at 42 Rockspring Lane in Buena Vista, Virginia (the "property" or the "cabin"). Plaintiff seeks $1,000,000 in damages for physical injuries; consequent and continuing medical expenses; pain and suffering; embarrassment, humiliation, and inconvenience; and prevention from transacting personal and business affairs. At all relevant times, Mr. Jarmak was a resident of New Jersey, and Ms. Ramos was a resident of Virginia. The Court has diversity jurisdiction to hear this dispute.

Ms. Ramos had her primary residence at the cabin, which sat on a secluded private lot overlooking the Blue Ridge Mountains. The cabin contained two bedrooms, a kitchen, laundry room, and porches on the front and back of the building. A cotton rope weave hammock hung between two trees in the backyard of the property. In 2007, Ms. Ramos began renting her cabin out to visitors on occasion to earn additional income. During the time visitors occupied her cabin, Ms. Ramos stayed at her father's house in nearby Lexington, Virginia. In order to attract visitors, Ms. Ramos advertised her cabin on the Internet by creating a website that included photographs of the interior and exterior of "Rockspring Cabin," a description of the residence's location and amenities, and a list of nightly and weekly rates charged to visiting occupants. The website advertised the cabin as being "fully furnished and equipped," offering "Cable TV, DVD, VCR," "Computer and high speed internet," "Comfortable, top quality beds," "Down comforters and pillows," "Hammock," and "Blue Ridge mountain views." The cabin was advertised as non-smoking. The website described the cabin's convenient location between Lexington and Buena Vista and its proximity to a golf course, a park, and the Blue Ridge Parkway. As to rates, a two-night minimum requirement was imposed. The cabin was offered at the rate of $200 per night on Fridays and Saturdays, $175 per night on weeknights, and $1,100 for an entire week. If more than two adults wished to stay at the cabin, a $25 fee was charged for each additional adult; children under the age of twelve were free. Ms. Ramos also advertised her property in the Lexington, Buena Vista, and Rockbridge County Visitor's Guide under the category "Cabins, Cottages and Guest Houses," and registered her property with the Lexington Visitor Center. In the Visitor's Guide, Ms. Ramos advertised that the cabin "Sleeps 4 plus."

Mr. Jarmak and his wife Lesia Jarmak owned a house in Ewing, New Jersey, which was their primary residence. Mr. Jarmak testified that they always travel somewhere to celebrate

their wedding anniversary. In 2008 he was looking for a place to stay near Lexington and located information about Ms. Ramos's property online. In August 2008, the Jarmaks contacted Ms. Ramos by email to inquire about the availability of the cabin in October. Through email correspondence, the parties agreed that Mr. and Ms. Jarmak would stay at the cabin for three nights beginning on October 2, 2008.[1] In an email sent to Ms. Ramos, Ms. Jarmak stated that her husband planned on using the hammock during their visit. The day before the Jarmaks' arrival, Ms. Ramos informed them by email that she would be out of town when they arrived, and that she would leave a key underneath a chair on the front porch so they could enter the cabin. In that email, Ms. Ramos provided detailed directions to the cabin and quoted the remaining balance owed for the Jarmaks' stay. The email also instructed the Jarmaks to contact Ms. Ramos on her cell phone if they had any questions, and informed them that she had someone she could send over to help in case of an emergency. In addition, Ms. Ramos informed the Jarmaks that they could stop at a bed and breakfast inn in Lexington to borrow movies, music, and books.

Two days after arriving at the cabin, on October 4, 2008, Mr. Jarmak attempted to use the hammock in the backyard. When he sat down on the hammock, some of the ropes snapped, causing him to fall to the ground. He weighed approximately 235 to 240 pounds at the time. Mr. Jarmak testified that he did not examine or look at the hammock before sitting down. After he fell, he examined the ropes that snapped and noticed they were frayed. He testified that he did not think he could have seen the problem with the hammock even if he had looked at it before sitting down on it. When Mr. Jarmak fell, he felt a "twinge" in his rear, which became a "little

---

[1] Plaintiff states in his brief that the Jarmaks stayed at the cabin for two nights beginning on October 2, and that the incident occurred on October 3 rather than on October 4, which is the date alleged in the complaint. The email correspondence in the record indicates that it was a three-night stay and corroborates the October 4 date alleged in the complaint. I proceed on the assumption that they stayed three nights at the cabin and the alleged injuries were sustained on October 4.

sore." Jarmak Dep. 81:12-15, Feb. 11, 2011. No bruising immediately resulted from the fall, nor did Mr. Jarmak seek medical attention at the time.

Upon his departure from the cabin, Mr. Jarmak left a handwritten note for Ms. Ramos in which he contested the balance he owed for the weekend at the cabin. He then wrote to "[p]lease note that the ropes on the hammock are rotted and some snapped when I sat on it." Ms. Ramos responded to Mr. Jarmak's note by email, explaining how she had arrived at the total balance owed for the weekend stay. She also thanked the Jarmaks for informing her about the hammock, stated that she planned to order a new one, and offered them a night at the cabin free of charge should they decide to return. Ms. Jarmak responded to this email approximately two weeks later with the following message:

> So sorry have not gotten back to you. After we came back—Peter had work related injury where he was in the hospital—and he is off for medical reasons. Herniated disc which resulted in severe sciatica and he is home all 'drugged' up on steroids and can hardly walk. We did enjoy your cabin and Lexington. Can you tell us exactly the remaining balance due for difference and I will send it out immediately.

Ms. Ramos responded with a restatement of the balance owed and informed Ms. Jarmak that she had purchased a new hammock and "will make a point in the future of examining it more often."

Mr. Jarmak filed the complaint on October 1, 2010, alleging one count of negligence. Mr. Jarmak alleges that as a business invitor, Ms. Ramos owed Mr. Jarmak, an invitee, the duty to use ordinary care to maintain the property and the improvements thereon in a reasonably safe condition. Pl.'s Compl. ¶ 15. Mr. Jarmak further alleges that Ms. Ramos had the duty to discover dangerous conditions on the property, to foresee possible injury, and to warn Mr. Jarmak of any unsafe condition about which Ms. Ramos knew, or, by the use of ordinary care, should have known. *Id.* ¶ 16.

## II. STANDARD OF REVIEW

The court should grant summary judgment if the pleadings, the discovery and disclosure materials on file, and any affidavits show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In order to preclude summary judgment, the dispute about a material fact must be "'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also JKC Holding Co. v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001). However, if the evidence of a genuine issue of material fact "is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 250. "As to materiality . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248. Once a motion for summary judgment is properly made and supported, the non-moving party may not rely merely on allegations or denials in its own pleading, rather it must set out "specific facts showing that there is a genuine issue for trial." *Celotex Corp.*, 477 U.S. at 324. When considering summary judgment motions, courts must view the facts in the light most favorable to the party opposing the motion. *Austin v. Clark Equip. Co.*, 48 F.3d 833, 835 (4th Cir. 1995). "[T]he court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

## III. DISCUSSION

Defendant's motion asserts that she is entitled to summary judgment on two grounds. First, Defendant argues that Defendant and Plaintiff entered into a landlord-tenant relationship,

and that a landlord has no duty to maintain in a safe condition any part of the leased premises that is under a tenant's exclusive control. Def.'s Br. Supp. Mot. Summ. J. at 5 (citing *Paytan v. Rowland*, 208 Va. 24, 26, 155 S.E.2d 36, 38 (1967)). As a tenant, Plaintiff assumed the risk of any defects present on the premises when Plaintiff took possession of the entire property, argues Defendant. *Id.* at 6 (citing *Caudill v. Gibson Fuel Co.*, 185 Va. 233, 239-40, 38 S.E.2d 465, 469 (1946) (holding that where the "right of possession and enjoyment of the leased premises" passes to the lessee, the tenant assumes all risk)). Second, Defendant argues that even if she owed a duty to maintain the premises in a safe condition, there is insufficient evidence to show that Defendant had actual or constructive knowledge of a defective condition on the premises. *Id.* at 7 (citing *Grim v. Rahe, Inc.*, 246 Va. 239, 242, 434 S.E.2d 888, 890 (1993)).

To begin, I must ascertain whether a landlord-tenant or an innkeeper-guest relationship attaches to the relationship between Ms. Ramos and Mr. Jarmak. An innkeeper owes a duty to his guests of reasonable care under the circumstances. *Kirby v. Moehlman*, 182 Va. 876, 884, 30 S.E.2d 548, 551 (1944) (quoting *E. Shore of Va. Agric. Ass'n v. LeCato*, 151 Va. 614, 619, 144 S.E. 713, 714 (1928)) ("While the common definition of negligence is the failure to use such care as an ordinarily prudent person would exercise under the same or similar circumstances, still negligence is a relative term and the degree of care in fact should be greater or less commensurate with the circumstances."); *see also Ely v. Blevins*, 706 F.2d 479, 480 (4th Cir. 1983) (interpreting Virginia law). While an innkeeper "is not an insurer of his guest's personal safety," the "responsibility for the premises is primarily on the innkeeper, and the guest may generally assume that [he is] safe." *Crosswhite v. Shelby Operating Corp.*, 182 Va. 713, 716, 30

S.E.2d 673, 674 (1944)[2]; *see also Kirby*, 182 Va. at 884, 30 S.E.2d at 551; *Ely*, 706 F.2d at 481 (rejecting claim against innkeeper of breach of implied warranty of suitability of fixtures in guest room because it imposed liability on innkeeper without any showing of unreasonable conduct or lack of care). "Like a passenger [on a common carrier], the guest of an innkeeper entrusts his safety to the innkeeper and has little ability to control his environment." *Taboada v. Daly Seven, Inc.*, 271 Va. 313, 325, 626 S.E.2d 428, 434 (2006), *aff'd on reh'g*, 273 Va. 269, 270, 641 S.E.2d 68, 68 (2007). A landlord does not owe a tenant the same level of care. *See Crosswhite*, 182 Va. at 715, 30 S.E.2d at 674. "[U]nlike a landlord, an innkeeper is in direct and continued control of the property and usually maintains a presence on the property personally or through agents." *Taboada*, 271 Va. at 324, 626 S.E.2d at 433. Thus, "while a lessee may be expected to do many things for his own protection," an innkeeper's guest is not as well situated to do so. *Id.*, 626 S.E.2d at 433-34 (quoting *Crosswhite*, 182 Va. at 715, 30 S.E.2d at 674).

Traditionally, an innkeeper was viewed as one who held out his house as a public place of accommodation for travelers. *See Alpaugh v. Wolverton*, 184 Va. 943, 947, 36 S.E.2d 906, 907-08 (1946). Inns commonly provided transient entertainment, such as food and lodging, to out-of-town travelers. *Id.* at 947-48, 36 S.E.2d at 908.[3] Over time, no bright line rule has been developed for determining when the relationship between an innkeeper and a guest attaches. It

---

[2] As recognized in *Taboada v. Daly Seven, Inc.*, to the extent that *Crosswhite* stands for the proposition that an innkeeper's duty of care to protect a guest from personal injury arises only from statute, *Crosswhite* has been superseded by subsequent legislation, which clarified that the duty or the liability imposed on innkeepers for personal injuries to guests by the common law was not abrogated by statute. 271 Va. 313, 322 n.3, 626 S.E.2d 428, 432 n.3 (2006), *aff'd on reh'g*, 273 Va. 269, 270, 641 S.E.2d 68, 68 (2007). Although working within the context of a statute, the court in *Crosswhite* drew heavily from common law principles of negligence and its development of the law related to the legal relationship of innkeeper to guest remains pertinent today.

[3] The statutory definitions cited by Plaintiff in his brief, while not applicable here, reinforce the characterization in the common law of inns as places for accommodating travelers. *See* Va. Code Ann. § 35.1-1 (defining "hotel" as "any place offering to the public for compensation transitory lodging or sleeping accommodations, overnight or otherwise, including but not limited to facilities known by varying nomenclatures or designations as hotels, motels, travel lodges, tourist homes, or hostels"); Virginia Residential Landlord and Tenant Act, Va. Code Ann. § 55-248.5 (holding exempt from requirements under the act "[o]ccupancy in a hotel, motel, vacation cottage, boardinghouse or similar lodging held out for transients unless let continuously to one occupant for more than thirty days").

still remains that "the controlling factor in determining whether the relationship of innkeeper and guest has been established is the intent of the parties." *Id.* at 948-49, 36 S.E.2d at 908 (holding that a hotel operator may be an innkeeper as to some of his patrons and a landlord or a restaurateur as to others).

In this case, Ms. Ramos held out her cabin as a place of accommodation for traveling guests. Ms. Ramos advertised the cabin as a fully equipped place to stay, offering such amenities as cable television, down comforters and pillows on top quality beds, and a computer from which the Internet could be accessed. The website highlighted the cabin's convenient location near attractions that would typically interest travelers, such as a golf course and the Blue Ridge Parkway. The cabin was advertised as non-smoking, which is a designation frequently used by hotels in reference to a guest room. Most importantly, the daily or weekly rate pricing structure for the cabin evidences that Ms. Ramos intended to accommodate travelers for brief stays. Moreover, charging by the number of adults staying in the cabin is a pricing convention associated with hotels. In addition to being advertised on the Internet, the cabin was listed in a visitor's guide brochure and registered with the local visitor's center. Evidently, Ms. Ramos sought out visiting tourists to purchase nights at her cabin. The Jarmaks also intended to use the cabin as a place of accommodation while visiting Virginia to celebrate their wedding anniversary. The Jarmaks owned their own house in New Jersey and only stayed for a brief period of three nights in Virginia, paying a nightly rate. The arrangement was made informally through email—no written lease or rental agreement was executed, and few terms of the stay were negotiated. There is little countervailing evidence from which to conclude that the parties intended to enter into a landlord-tenant relationship. In Defendant's favor is the fact that the cabin included its own bathrooms, kitchen, and laundry facilities, and the Jarmaks had full access

to the interior of the cabin and its grounds. But full access does not necessarily mean exclusive possession. I find it plain that Ms. Ramos intended for the cabin to be used for short stays by visitors attracted to a scenic area of Virginia, and that Mr. Jarmak intended to use the cabin for those purposes. Because an innkeeper-guest relationship applies to this case, Defendant is not entitled to summary judgment on the ground that she had no duty to maintain in a safe condition any part of the leased premises that was under Plaintiff's control.

I next address whether there is sufficient evidence to show that Ms. Ramos had actual or constructive knowledge of the defective hammock. Ms. Ramos argues that Mr. Jarmak has not provided sufficient evidence to show that she did not know or have reason to know that the ropes of the hammock would snap when used. A business invitor owes a duty to protect or warn invitees against a defective condition on the premises of which the invitor had actual or constructive knowledge. *Grim*, 246 Va. at 242, 434 S.E.2d at 889. Constructive knowledge or notice of a defective condition of a premise may be shown by evidence that the defect was noticeable and had existed for a sufficient length of time to charge its possessor with notice of its defective condition. *Id.*, 434 S.E.2d at 890. Although the responsibility for the hotel premises is primarily on the innkeeper, *Kirby*, 182 Va. at 884, 30 S.E.2d at 551, the innkeeper owes a duty to its guests of *reasonable* care under the circumstances, and is not the insurer of its guests' safety, *Ely*, 706 F.2d at 481. *See also Crosswhite*, 182 Va. at 716, 30 S.E.2d at 674. The innkeeper must at least possess constructive knowledge of the unsafe condition in order to be found negligent. Indeed, the Supreme Court of Virginia in *Kirby* stated that where a hotel proprietor "knew or should have known of a danger that might have been easily removed," the proprietor had a duty to remove the danger. *Kirby*, 182 Va. at 885, 30 S.E.2d at 551.

Before reviewing the evidence in the record of constructive knowledge, I must take up Plaintiff's spoliation argument. Plaintiff requests that adverse inferences as to the condition of the hammock and any notice issues be drawn against Defendant because Ms. Ramos discarded the hammock after learning that it had broken when Mr. Jarmak sat on it. The imposition of a sanction (e.g., an adverse inference) for spoliation of evidence is an inherent power of federal courts—though one limited to that action necessary to redress conduct "which abuses the judicial process"—and the decision to impose such a sanction is governed by federal law. *Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 590 (4th Cir. 2001) (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45-46 (1991)). Moreover, spoliation is not a substantive claim or defense but a "rule of evidence," and thus is "administered at the discretion of the trial court." *Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148, 155 (4th Cir. 1995). The spoliation of evidence rule allows the drawing of an adverse inference against a party whose intentional conduct causes the destruction of evidence. *Hodge v. Wal-Mart Stores, Inc.*, 360 F.3d 446, 450 (4th Cir. 2004). But such an inference "cannot be drawn merely from his negligent loss or destruction of evidence; the inference requires a showing that the party knew the evidence was relevant to some issue at trial and that his willful conduct resulted in its loss or destruction." *Id.* (quoting *Vodusek*, 71 F.3d at 156).

No sanction for spoliation of evidence is warranted here. Ms. Ramos testified that she disposed of the hammock shortly after it was broken, long before the complaint in this action was filed. At that time, she was only aware of what had been conveyed to her by the Jarmaks in the handwritten note and in subsequent emails. The note merely informed her that the ropes on the hammock were rotted and some snapped when Mr. Jarmak sat on it. The note did not tell Ms. Ramos that Mr. Jarmak had fallen when he sat on the hammock, nor did it inform her that

Mr. Jarmak was injured in his fall. The subsequent emails exchanged between Ms. Ramos and the Jarmaks were cordial in tone and touched on subjects such as the amount due for payment, Mr. Jarmak's work-related injury, and Ms. Ramos's intention to replace the hammock. The Jarmaks did not state in any of these emails that Mr. Jarmak had hurt himself when he sat on the hammock. Without notice that Mr. Jarmak was injured while using the hammock, Ms. Ramos had no way of knowing at the time she destroyed the hammock that it would be physical evidence relevant to an issue at trial in a legal claim against her.

Thus, I must examine the evidence as it has been presented, viewing the facts in the light most favorable to Mr. Jarmak. The burden of showing that Ms. Ramos knew or should have known by the exercise of reasonable care of a defect in the hammock is on Mr. Jarmak. *See Gauldin v. Va. Winn-Dixie, Inc.*, 370 F.2d 167, 169 (4th Cir. 1966). The evidence shows that Ms. Ramos, the innkeeper, provided a hammock to be used by her guests. Ms. Ramos could not remember for how long she had the hammock. When Ms. Ramos did not have guests she lived at the cabin, and she maintained the property herself in order to keep it free from unsafe conditions. She testified that she looked at the hammock on a regular basis, though she did not routinely inspect the property before guests arrived. Based on her advertisement of the hammock as an amenity, the Jarmaks mentioned to Ms. Ramos in advance of their stay that they intended to use the hammock. Having received this notice, Ms. Ramos did not make a special examination of the hammock to ensure it was suitable for the Jarmaks' use. Mr. Jarmak testified that when he sat down on the hammock, he fell right through it. He testified that although he did not examine or look at the hammock before he sat down on it, after he fell, he examined the ropes that snapped and noticed they were frayed. Mr. Jarmak stated that based on the condition

of the ropes, had he examined the hammock closely beforehand, he did not think he could have seen that the ropes were defective.

I hold that a reasonable jury could not conclude, from this evidence, that Ms. Ramos had actual or constructive notice of the unsafe condition of the hammock because there is no evidence that the condition was detectable by Ms. Ramos. Although the evidence does not reveal when Ms. Ramos last examined the hammock, her testimony that she examined it on a regular basis is not controverted by other evidence in the record. There is no indication the hammock's ropes were visibly frayed before they snapped; Mr. Jarmak merely observed they were frayed after they broke. Moreover, Mr. Jarmak believed—based on his examination of the ropes after they snapped—that the defective condition of the ropes would not have been visible beforehand. There is no evidence of when the hammock ropes became rotten or for how long they were in a dangerous condition. Mr. Jarmak has supplied no facts to suggest that Ms. Ramos knew about a problem with the hammock or that a problem was even noticeable. Because Mr. Jarmak failed to meet his burden to establish that Ms. Ramos had reason to know of any unsafe condition, Mr. Jarmak cannot demonstrate that Ms. Ramos breached a duty owed to him. I will grant Ms. Ramos's motion for summary judgment in her favor.

## IV. CONCLUSION

For the reasons stated herein, I will grant Defendant's Motion for Summary Judgment (docket no. 11). This matter will be stricken from the Court's active docket. An appropriate order will follow.

The Clerk of the Court is hereby directed to send a certified copy of this memorandum opinion and the accompanying order to all counsel of record.

Entered this 13th day of July, 2011.

                                                                                                           NORMAN K. MOON  
                                                                                                           UNITED STATES DISTRICT JUDGE